1
2
3
4
5
6
7
8

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

9   UNITED STATES OF AMERICA,              )   CR 06-1289-TUC-FRZ (HCE)
                                          )
10              Plaintiff,                 )   **REPORT AND RECOMMENDATION**
                                          )
11   vs.                                   )
                                          )
12                                         )
     VICENTE RUIZ-GAXIOLA,                 )
13                                         )
                Defendant.                 )
14                                         )
                                          )
15   _____)

16      Defendant Vicente Ruiz-Gaxiola came before this Court on March 14, 2008 pursuant to

17   *Sell v. United States,* 539 U.S. 166 (2003) (hereinafter "*Sell* hearing") to determine whether

18   Defendant should be ordered involuntarily medicated solely for the purpose of restoring him

19   to mental competence to stand trial.

20      The Magistrate Judge recommends that the District Court, after independent review and

21   consideration, grant the Government's request for an order to involuntarily medicate

22   Defendant for the reasons stated herein.

23   I. PROCEDURAL AND FACTUAL HISTORY

24      A. Charge

25      Defendant was charged by indictment with Illegal Re-Entry After Deportation in that on

26   or about June 27, 2006 at or near Rio Rico in the District of Arizona, Defendant, an alien,

27   entered and was found in the United States of America after having been denied admission,

28   excluded, deported, and removed therefrom at or near El Paso, Texas on or about May 6,

1  2005; and at or near El Paso, Texas on or about June 2, 1994, and did not obtain the express

2  consent of the Attorney General or the Secretary of the Department of Homeland Security

3  to reapply for admission thereto, in violation of 8 U.S.C. §1326 with enhanced punishment

4  under subsection (b)(2).  (Doc. No. 10)

5  B. Procedural Background

6  On July 14, 2006 Defendant through counsel moved to be evaluated by Dr. Stephen V.

7  Streitfeld, M.D., to determine his competency to stand trial (Doc. No. 8).  On July 18, 2006,

8  the Court ordered that Defendant be examined and evaluated by Dr. Streitfeld. (Doc. No. 9)

9  On September 11, 2006   Dr. Streitfeld completed his examination and evaluation of

10  Defendant and in his report (hereinafter "Streitfeld Report p.____" ) concluded that

11  Defendant was not competent to stand trial.  (Streitfeld Report p. 2)

12  On October 4, 2006 this matter came on for a competency hearing pursuant to 18 U.S.C.

13  § 4241(c),(d) with Defendant, defense counsel and Government counsel present.  After

14  review of Dr. Streitfeld's Report, the Court found by a preponderance of evidence that

15  Defendant was suffering from a mental disease or defect rendering him mentally incompetent

16  to the extent he was unable to understand the nature and consequences of the proceedings

17  against him or to assist properly in his defense and was then incompetent to stand trial. (Doc.

18  No. 20)  Consequently, pursuant to 18 U.S.C. §4241(d), the Court ordered that  Defendant

19  be committed to the custody of the Attorney General to be hospitalized for a period not to

20  exceed four months to determine whether there was a substantial probability that in the

21  foreseeable future Defendant would attain the capacity to permit the trial to proceed.  (Id.)

22  Defendant was transported to, hospitalized and evaluated at Federal Medical Center-Butner,

23  North Carolina (hereinafter "FMC-Butner").

24  On March 9, 2007 FMC-Butner, after performing a competency restoration study of

25  Defendant, issued a Forensic Evaluation Report (hereinafter "FMC-Butner Report") wherein

26  it was concluded that Defendant was not competent to proceed to trial but that there was a

27  substantial likelihood that Defendant could be restored to competency with the administration

28

of antipsychotic medication.  Defendant then and now has refused to take antipsychotic medication.

On March 29, 2007 a status hearing was held without Defendant's presence.  The Court advised respective counsel, with no objection from the Government, that the Court would be issuing an order that an administrative hearing (hereinafter "*Harper* hearing") be conducted pursuant to 28 C.F.R. §549.43 and *Washington v. Harper*, 494 U.S. 210 (1990).  The Court entered an order on April 10, 2007 that an administrative *Harper* hearing be conducted with a report (hereinafter "*Harper* Report") to issue.  (Doc. No. 40)  After a convoluted series of appeals to both the District Court and the Court of Appeals by Defendant, the Court on September 20, 2007 reiterated its order that a *Harper* hearing be conducted with a report to issue.  (Doc. No. 92).

On October 4, 2007 FMC-Butner conducted a *Harper* hearing and issued a report with appended documents memorializing the *Harper* hearing findings.  It was the finding of FMC-Butner that Defendant did not meet *Harper* criteria for the administration of involuntary medication in that he did not suffer from a mental illness or defect which required treatment with medication due to danger to self or others, or grave disability.

On December 7, 2007 the Court ordered that the U.S. Probation Office prepare a Preliminary U.S.S.G. report pertaining to Defendant outlining 1) the statutory maximum period of incarceration for the offense pending against Defendant; and 2) the probable U.S.S.G. offense level and Criminal History Category for that offense.  (Doc. No. 106)  A Preliminary U.S.S.G. Report (hereinafter "Status Report") issued on January 18, 2008.

On December 18, 2007 the Court ordered that Defendant disclose to the Court and Government counsel Defendant's examining physician and when examination of Defendant would occur.  (Doc. No. 109)  On December 21, 2007 Defendant filed notice to the Court that Defendant would be examined by C. Robert Cloninger, M.D., on January 7, 2008. (Doc. No. 112)  An evaluation report by Dr. Cloninger issued on January 17, 2008 (hereinafter "Cloninger Report p._____").

On January 11, 2008 Defendant moved to continue the previously set *Sell* hearing of February 15, 2008 and the Court ordered that the *Sell* hearing be reset to March 14, 2008. (Doc. Nos. 115, 118)

C. Summary of Reports Issued

1.  18 U.S.C. §4241(b) Streitfeld Report

Dr. Streitfeld in his September 20, 2006 report stated that Defendant denied that he has been in mental health or substance abuse treatment.  (Streitfeld Report, p.2)  Moreover, Defendant was not then taking any medications. (Id.)

In determining that Defendant manifested grandiose religiously-themed delusions, Dr. Streitfeld determined that Defendant did not appear to pose an imminent risk of harm to self or others.  (Id. at pp. 4, 6)   Despite Dr. Streitfeld's detailed description of Defendant's rudimentary understanding of his rights, as expressed by Defendant in essentially simplified terms synonymous of those rights, Dr. Streitfeld stated that Defendant lacked the ability to appropriately assist his attorney in the preparation of a defense to the charges.  (Id. at pp. 2, 7-8)

Dr. Streitfeld recommended that Defendant:

> ...be admitted to a structured inpatient restoration to competency program,..., where further evaluation, counselling [sic] regarding issues relevant to competency to stand trial and *stabilization on psychotropic medications to reduce delusions and hallucinations can be undertaken*.

(Id. at p. 2) (emphasis added).

2. 18 U.S.C. §4241(d)(1) FMC-Butner Report

During Defendant's hospitalization at FMC-Butner, Staff Psychologist Carlton Pyant, Ph.D., and Staff Psychiatrist Mark Cheltenham, M.D., (hereinafter "treating physicians") observed that Defendant displayed symptoms of psychosis including grandiose delusions that were religiously-themed.  (FMC-Butner Report, p. 4)  Defendant was also diagnosed with anti-social personality traits not rising to a disorder due to lack of evidence of conduct disorder prior to the age of fifteen years.  (Id. at p. 7)  However, Defendant did evidence traits of conduct disorder that treating physicians at FMC-Butner opined should be noted:

> He has failed to maintain social norms with respect to lawful
> behavior, including arrests for shoplifting, numerous arrests for
> possession of a controlled substance, possession of a firearm by
> a restricted person, and assault on a police officer.  He has also
> shown reckless disregard for safety of self or others, as indicated
> by a [sic] prior arrests for assault and discharging a firearm.

(Id.)

Treating physicians at FMC-Butner opined that Defendant's delusional belief system would inhibit Defendant's ability to assist his attorney in defending him against the alleged offense.  (Id. at p. 8).

While at FMC-Butner Defendant reported no history of taking psychotropic medication  (Id. at pp. 2-3)  Consequently there was no established pattern of treatment response to medication which could be reviewed and upon which to base the probability of Defendant's response to medication.  (Id. at p.9)  Because Defendant labors under a psychotic disorder; i.e., delusional disorder-grandiose type, rendering him incompetent to stand trial, treatment with antipsychotic medication is the accepted and appropriate treatment. (Id.) However, because Defendant is currently delusional, denies mental illness, and refuses treatment with medication, anitpsychotic medication would have to be administered involuntarily.  (Id. at p. 13)

Treating physicians at FMC-Butner opined that Defendant's delusional beliefs could be decreased, or eliminated over time, by antipsychotic medication.  In turn, Defendant's decision-making, judgements, and perceptions would be enhanced and thus improve his ability to assist his attorney.  (Id. at p. 10)  Because of the chronic and persistent nature of Defendant's psychosis, antipsychotic medication would restore Defendant to competency. (Id. at p. 11)  Alternative and less intrusive  psychotherapeutic methods as group or individual counseling, would be ineffective because of Defendant's lack of insight and understanding that he has a mental illness and is in need of treatment.  (Id.)

Treating physicians at FMC-Butner opined that although antipsychotic  medication treatment may have side effects, any side effects are monitored and managed in a clinically appropriate manner.  (Id.)  Recently developed medications are now available which have lesser side effects than previous medications and are better tolerated by patients.  (Id.)  These

1   recently developed medications are available in injectable form and substantial effort is made

2   to enlist a patient's cooperation to take medication orally.  (Id.)  The treating physicians

3   opined that the proposed treatment would be substantially unlikely to have serious side

4   effects which would interfere significantly with Defendant's ability to assist his attorney in

5   preparing and conducting a defense.  (Id.)

6   Finally, treating physicians at FMC-Butner opined that treatment with antipsychotic

7   medications is the standard and accepted treatment for anyone diagnosed with delusional

8   disorder-grandiose type, such as Defendant.  (Id. at p. 12)  Because Defendant does not have

9   any other chronic medical condition and is not receiving other medications, the risk of drug-

10  to-drug interaction is non-existent.  (Id.)  Thus, treatment with antipsychotic medication is

11  medically appropriate. (Id.)

12  ### 3. 28 C.F.R. §549.43 *Harper* Report

13  On October 4, 2007 Staff Psychologist Carlton Pyant at FMC-Butner recommended

14  that a hearing be conducted to determine whether Defendant met criteria for involuntary

15  medication pursuant to 28 C.F.R. §549.43.  This was based on intermittent acts of verbally

16  aggressive behavior.

17  A *Harper* hearing was conducted and a finding was  made that Defendant persists

18  with delusional disorder-grandiose type with underlying persecutory delusions.  (*Harper*

19  Report, p. 8)  Although irritable, and at times verbally abusive, Defendant has not received

20  any incident reports for conduct violations.  (Id.) It was also found that Defendant was not

21  a danger to self or others, or gravely disabled. (Id. at p. 9).

22  ### 4.  C. Robert Cloninger, M.D., Report

23  Defense expert Dr. Cloninger examined Defendant on January 7, 2008 by video

24  teleconference for two hours and ten minutes.  In preparing to examine Defendant, Dr.

25  Cloninger reviewed:  1) a July 24, 2000 Presentence Report prepared in the U.S. District

26  Court for the District of Nebraska; 2) a July 27, 2000 Judgment in the U.S. District Court for

27  the District of Nebraska; 3) a transcript of Defendant's October 3, 2006 arraignment in the

28

1    U.S. District Court for the District of Arizona; 4) the Streitfeld Report; 5) the FMC-Butner

2    Report; and 6) the *Harper* Report.  (Cloninger Report, p.2)

3         Based upon his preparation and examination of Defendant, Dr. Cloninger prepared

4    a report.   Therein Dr. Cloninger was in agreement that Defendant's competency was

5    consistent as previously determined in the Streitfeld Report and FMC-Butner Report (Id. at

6    p. 8) In Dr. Cloninger's opinion, Defendant's diagnosis is delusional disorder-grandiose type

7    and personality disorder with prominent inferiority feelings and hypersensitivity to

8    humiliation and powerlessness.  (Id. at p. 9)  Dr. Cloninger opined that there is nothing to

9    indicate Defendant is a danger to self or others.  (Id. at p.10).

10        It is Dr. Cloninger's opinion that involuntarily administering Defendant with

11   antipsychotic medication does not have a substantial likelihood of restoring him to

12   competency. (Id. at p.11)  To do so would be harmful and would worsen Defendant's illness.

13   (Id.)  Dr. Cloninger opines that Defendant's delusional disorder is distinguishable from

14   schizophrenia and warrants distinct treatment.  (Id. at p.12):

15               The key to treating Mr. Ruiz-Gaxiola most effectively is to
                 recognize that he has deep-seated and lifelong inferiority
16               feelings that make him hypersensitive to feelings of
                 powerlessness and struggles with authoritarian figures.
17               Therefore, involuntary treatments are likely to make him worse,
                 rather than better, which the staff at Butner has completely
18               failed to recognize.   It is essential to minimize authoritarian
                 controls and to encourage Mr. Ruiz-Gaxiola to take the initiative
19               in suggesting what would be helpful to him, while of course not
                 agreeing to do anything unacceptable to the staff.  It is also
20               essential to provide Mr. Ruiz-Gaxiola with voluntary access to
                 natural means of relaxation, such as exercise and other
21               relaxation techniques.

22   (Id. at pp. 12-13) Moreover, there is no scientific evidence that the anitpsychotic medication

23   proposed by FMC-Butner has any benefit in patients with delusional disorder.   (Id.)

24   Defendant's psychotic delusional disorder is exacerbated by his incarceration and "release

25   from incarceration would be expected to improve his mental state or provide conditions that

26   would facilitate his recovery."  (Id. at pp. 15-16)

27        Defendant has deep-seated and lifelong feelings of inferiority and hypersensitivity to

28   feelings of powerlessness, e.g., authority figures encountered while incarcerated.  Defendant

1   compensates with pathological narcissism, i.e., empowerment by grandiose delusional beliefs

2   in religiously-themed revelations.  (Id. at p. 18)  Defendant's need for empowerment

3   increases his grandiose and persecutory delusions when prompted by authority figures'

4   efforts to control him.  This distrust of authority figures in turn impedes preparation for his

5   defense.  (Id.) Conceivably, authority figures could include his attorney.  (*See* Id. at p. 6)

6   ("He feels that his defense attorney is helping the courts but not him, and is unaware of

7   efforts she is making on his behalf.")

8   　　　Dr. Cloninger states that effective treatment requires recognition of Defendant's

9   hypersensitivity to powerlessness and thus, he must not be treated against his will with

10   medication.  (Id. at p. 20):

11   　　　　　　He needs to be treated with compassion and respect, or removed
            from the stress of prolonged incarceration, which initially
12   　　　　　　precipitated his psychotic state in 2005.

13   (Id.) Dr. Cloninger opines the inefficacy of recommended medication to address Defendant's

14   delusional disorder grandiose type.  (Id. at p. 24)  Consequently, the less intrusive method

15   of treatment is:

16   　　　　　　...to let go of any effort at involuntary treatment. Let Mr. Ruiz-
            Gaxiola know that the staff has recognized that involuntary
17   　　　　　　treatment of someone with his condition is likely to be harmful
            and is contra-indicated.  Give him the opportunity to ask for
18   　　　　　　activities or help that he wants, but let him know the staff will
            not accept anything with which they disagree.   Provide
19   　　　　　　voluntary access to exercise, relaxation and confidential
            psychotherapy, which would allow Mr. Ruiz-Gaxiola to let go
20   　　　　　　of his defensiveness and observe his own thoughts rationally
            without excessive judging and blaming.  In other words, non-
21   　　　　　　intrusive positively-oriented therapies are available that can
            allow Mr. Ruiz-Gaxiola to be more calm and yet feel more self-
22   　　　　　　directed.

23   (Id. at pp. 31-32).

24   II.  THE *SELL* HEARING

25   　　　"[T]he Constitution permits the government involuntarily to administer antipsychotic

26   drugs to a mentally ill defendant facing serious criminal charges in order to render that

27   defendant competent to stand trial...."  *Sell*, 539 U.S. at 179.  However, the court may direct

28   such involuntary medication only when the court finds that: 1) important governmental

interests are at stake; 2) the medical treatment is substantially unlikely to have side effects that may undermine the fairness of the trial; 3) involuntary medication is necessary significantly to further the governmental trial-related interests; and 4) the treatment is medically appropriate. *Id.*

A.  The Important Governmental Interests Factor

The Court in its findings of facts and conclusions of law "must find that *important* governmental interests are at stake." *Id.* at 180  (emphasis in original).

This is a legal question subject to *de novo* review. *United States v. Hernandez-Vasquez*, 513 F.3d 908, 915 (9th Cir. 2008). The government has an interest in prosecuting a defendant accused of a serious crime, be it against person or against property. *Sell* does not offer any definition or explanation of what constitutes a "serious crime."  However:

> *Sell* does not suggest that non-property, non-violent crimes, such as those arising under federal drug or immigration laws, are not fundamental to a scheme of ordered liberty.

*Id.* at 918. Consequently, the Government's interest in prosecuting the Defendant  in conjunction with "other relevant factors such as Defendant's prior offenses, the predatory nature of those offenses and the closeness in time of the prior offenses to the current prosecution...", *Id.* at 919, is sufficiently important to justify involuntary administration of medication. The Court must consider the facts of the individual case in assessing the Government's interest in prosecuting the defendant. *Sell,* 539 U.S. at 180. Consequently, special or relevant circumstances may lessen, but not dissipate entirely, the Government's interest in prosecution.

A relevant factor is the likely guideline range the individual defendant is facing as a result of his offense and criminal history. *Hernandez-Vasquez*, 513 F.3d at 919.   The governmental interest to prosecute is lessened if a defendant's confinement is akin in length to what he would serve once convicted and sentenced:

> The Government has a substantial interest in timely prosecution. And it may be difficult or impossible to try a defendant who regains competence after years of commitment during which memories may fade and evidence may be lost. *The potential for*

1
2
3
4

*future confinement affects, but does not totally undermine, the strength of the need for prosecution.  The same is true of the possibility that the defendant has already been confined for a significant amount of time (for which he would receive credit toward any sentence ultimately imposed, See 18 U.S.C. §3585(b)).*

5   *Sell*, 539 F.3d at 180 (emphasis added).

6   Defendant is currently 53 years of age.  He is a citizen of the Republic of Mexico

7   currently facing a charge of Illegal Re-Entry After Deportation pursuant to 8 U.S.C. §1326

8   with enhanced punishment under subsection (b)(2).  The United States Probation Office for

9   the District of Arizona prepared a Status Report regarding Defendant's criminal history.

10   Therein, it was determined that statutorily Defendant is facing up to 20 years of

11   incarceration.  Defendant's adjusted offense level is 24 with a Criminal History Category of

12   VI based upon eighteen criminal history points.  Thus, Defendant faces 100 to 125 months

13   incarceration.  Defendant will have served approximately 20 months and 11 days at the time

14   of his March 14, 2008 *Sell* hearing.[1]

15                    1.  Defendant's Criminal Background

16   Defendant's criminal history is extensive and dates back to 1984.  The overwhelming

17   number of Defendant's adult convictions are for drugs. (Status Report) The following is a

18   summary of Defendant's crime record by date, nature and sentence imposed.[2] :

19   01-21-84      misdemeanor Disorderly Conduct

20   11-30-86      Conspiracy to Possess Controlled Substance - 30 days'
21                 incarceration

22   10-27-87      felony Possession of Marijuana - 18 months'
              incarceration

23   11-10-87      misdemeanor Loitering - 7 days' incarceration

24   _____

25   [1] The U.S. Probation Office Status Report Calculates 718 days or approximately 24
26   months from date of arrest, June 27, 2006, to date of the *Sell* hearing, March 14, 2008.  The
     Court calculates 626 days, or 20 months 11 days, for the same time period.

27   [2] Offenses which were counted for calculation of criminal history points are  indicated
28   by parenthesized asterisk and point(s).

| | | |
|---|---|---|
| 11-13-87 | felony Possession of Controlled Substance - 18 months' incarceration concurrent |
| 12-11-87 | misdemeanor Destruction of Property - time served |
| 01-18-89 | misdemeanor Criminal Trespass - 2 days' incarceration and 6 months' probation |
| 04-07-89 | misdemeanor Illegal Entry - 6 months' incarceration and 12 months' supervised release |
| 02-28-90 | felony Possession of Marijuana - 18 months' incarceration |
| 07-27-93 | felony Attempted Possession With Intent to Distribute Controlled Substance - 10 days' incarceration<br>felony Attempted Aggravated Assault - 10 days' incarceration |
| 12-31-93 | felony Possession of Marijuana/Hashish for Sale - 39 days' incarceration |
| 04-27-94 | felony Attempted Possession of Cocaine 365 days' incarceration (335 days suspended) and 36 months' probation |
| 11-16-94 | felony Possession Base Rock Cocaine For Sale - 21 months' incarceration (*3 points) |
| 10-19-95 | misdemeanor Unlawful Consumption of Alcohol in Public - 5 days' incarceration |
| 11-15-95 | misdemeanor Possession of Marijuana - 5 months' incarceration (*2 points) |
| 01-15-96 | felony Distribution of Cocaine - 5 years' incarceration (*3 points) |
| 01-25-96 | felony Possession of Cocaine - 5 years' incarceration concurrent (*3 points) |
| 06-28-97 | misdemeanor Littering and Shoplifting-fined |
| 01-12-98 | misdemeanor Attempted Assault on a Peace Officer - 35 days' incarceration (*1 point) |
| 04-26-99 | felony Re-Entry After Deportation - 66 months' incarceration (*3 points) (*2 points for instant offense committed while under sentence) (*1 point for instant offense committed within two years after release) |

Defendant's arrest record wherein no convictions resulted is also extensive and interspersed among his numerous convictions.  These arrests overwhelmingly involve drug offenses:

| | |
|---|---|
| 11-29-85 | Shoplifting |
| 01-01-88 | Possession of a Controlled Substance |
| 08-26-91 | Trespassing/Possession of a Controlled Substance |
| 11-25-92 | Possession of Marijuana |
| 06-28-93 | Driving Under the Influence |
| 07-02-93 | Drinking Alcohol in a City Park |
| 12-23-93 | Possession of Marijuana For Sale |
| 03-26-94 | Possession of Marijuana |
| 07-31-97 | Trespassing |
| 12-28-97 | Drinking Alcohol in Public |
| 01-12-98 | Sell/Furnish Marijuana, Possession of Marijuana For Sale |
| 02-19-99 | Possession With Intent to Distribute a Controlled Substance/Disorderly Conduct |
| 02-23-99 | Trespassing |

Defendant was arrested on April 26, 1999 in Lincoln, Nebraska and charged in U.S. District Court for the District of Nebraska with felony Illegal Re-Entry After Deportation pursuant to 8 U.S.C. §1326 with enhanced punishment under subsection (b)(2).  Defendant was sentenced on July 25, 2000 to 66 months of incarceration with 24 months of supervised release to follow.  Defendant was released from incarceration and deported on May 6, 2005. Defendant is alleged to have re-entered the United States without authorization in the instant offense on June 27, 2006.

### 2. Likely Guideline Range

The likely guideline range is the appropriate starting point for the analysis of a crime's seriousness, albeit not the only factor.  *Hernandez-Vasquez,* 513 F.3d at 919.  Presently

Defendant faces 100 to 125 months of incarceration for a Level 24 Criminal History Category VI offense of Illegal Re-Entry After Deportation.  If Defendant demonstrates acceptance of responsibility by pleading guilty, then the offense level would be reduced to level 22.  *See* U.S.S.G. §3E1.1(a).  Defendant would then face 84 to 105 months of incarceration. If Defendant, after restoration to competence, timely notified the government of an intention to plead guilty, then the offense level would be reduced by an additional level to 21.  *See* U.S.S.G. § 3E1.1(b).  Defendant would then face 77 to 96 months of incarceration.  It is unknown at this time whether the Government would extend to Defendant the standard additional three level reduction for "fast-track".  If so, then the offense level would be reduced to level 18. *See* U.S.S.G. §5K3.1.  Defendant would then face 57 to 71 months of incarceration.

### 3. Defendant's Recidivism

The nature of the charge presently pending against Defendant is his alleged illegal re-entry into the United States after having been deported subsequent to a conviction for the commission of an aggravated felony.  Defendant has nine felony convictions for drugs starting in 1987, four of which involve intended drug trafficking. (Status Report, pp. 5-10)  Moreover, Defendant has been removed or deported from the United States thirteen times: December 21, 1976, June 15, 1981, December 12, 1986, November 20, 1988, October 21, 1989, April 1, 1991, September 19, 1991, December 2, 1992, March 13, 1993, October 7, 1993, June 2, 1994, May 5, 1997, and May 6, 2005.  (Id. at p.15)  The Court cannot ignore the obvious need to protect the community from a recurrence of such serious criminal conduct by Defendant.  The Government has an interest in protecting:

> ...through application of the criminal law the basic need for security.

*Sell,* 539 U.S. at 180.  Enforcement of drug and immigration laws are "fundamental to a scheme of ordered liberty." *Hernandez-Vasquez,* 513 F.3d at 918 (citing *Sell*, 539 U.S. at 180).  The Court recognizes that the charged offense is related to Defendant's serious and

1  recidivistic criminal history, i.e., illegal re-entry subsequent to the commission of aggravated

2  felonies which constitute serious crimes for *Sell* purposes.

3                                  4. Civil Commitment

4          In evaluating the Government's interest in prosecuting Defendant, a "special

5  circumstance" which would affect, but not totally undermine, this interest is potential for

6  future confinement by civil commitment to a medical facility. *Sell,* 539 U.S. at 180. In order

7  to civilly commit Defendant herein, the Government would have to convince a court by clear

8  and convincing evidence that Defendant's release would create a substantial risk of bodily

9  injury to another person. 18 U.S.C. §4246(a), (d)(2), (e), (f), (g). Consequently:

10          [T]he defendant's failure to take drugs voluntarily, for example,
        may mean lengthy confinement in an institution for the mentally

11          ill-*and that would diminish the risks that ordinarily attach to*
        *freeing without punishment one who has committed a serious*

12          *crime.*

13  *Id*. (emphasis added) The finding in the *Harper* Report is that Defendant is *not* a danger to

14  self or others. Thus, the Government's interest in prosecuting Defendant increases in an

15  attempt to insure, by conviction and incarceration, at least for a time, that Defendant will not

16  violate the community's "basic need for security" and "scheme of ordered liberty."

17          The Court finds that the Government has an interest in medicating Defendant to render

18  him competent for trial and sentencing, should he be convicted. Doing so furthers Congress'

19  goal that a sentence imposed accurately reflects the nature of the offense and is tailored to

20  a defendant's circumstances. *United States v. Booker*, 543 U.S. 220, 253-254 (2005)

21  (sentencing statutes advance "similar relationships between sentences and real conduct").

22  A court shall impose a sentence "sufficient, but not greater than necessary," to provide just

23  punishment, deter criminal conduct, protect the public, and rehabilitate the defendant. 18

24  U.S.C. §3553(a)(2)(A), (B), (C) and (D).

25          B. The Side Effects Factor

26          The Court "must conclude that involuntary medication will *significantly further* [ ]

27  concomitant state interests." *Sell,* 539 U.S. at 181 (emphasis in original).

28

A defendant has a significant constitutionally protected "liberty interest" in "avoiding the unwanted administration of antipsychotic drugs...." *Harper*, 494 U.S. at 221. However, the Government has a concomitant interest in preserving "the basic human need for security" as well as "a concomitant constitutionally essential interest in assuring that the defendant's trial is a fair one." *Sell* 539 U.S. at 180.

The court must make two findings under this factor: 1) "[i]t must find that administration of the drugs is *substantially likely* to render the defendant competent to stand trial"; and 2) "[a]t the same time, it must find that administration of the drugs is *substantially unlikely* to have side effects that will interfere significantly with the defendant's ability to assist counsel in conducting a trial defense, thereby *rendering the trial unfair." Sell*, 539 U.S. at 181 (emphasis added) These two findings:

> ...must identify: (1) the specific medication or range of medications that the treating physicians are permitted to use in their treatment of the defendant, (2) the maximum dosages that may be administered, and (3) the duration of time that involuntary treatment of the defendant may continue before the treating physicians are required to report back to the court on the defendant's mental condition and progress.

*Hernandez-Vasquez*, 513 F.3d at 916 - 917.

### 1. Substantial Likelihood of Competence

Three doctors testified at Defendant's *Sell* hearing: Government witnesses Drs. Carlton Pyant (hereinafter "Pyant p.____") and Mark Cheltenham (hereinafter "Cheltenham p.____"); and defense witness, Dr. Robert Cloninger (hereinafter "Cloninger p.___"). All three doctors were qualified and deemed to be expert witnesses. (Cloninger p.6; Pyant pp. 69-70; Cheltenham p. 97) All three doctors testified that Defendant is distrustful or that his delusional ideations are fixed. (Cloninger p. 17; Pyant pp. 72-73; Cheltenham pp. 98-99) All three doctors testified that Defendant does not believe he is mentally ill in need of medication. (Cloninger p. 15; Pyant p. 75; Cheltenham pp. 121-122) All three doctors testified that Defendant labors under delusional disorder-grandiose type. (Cloninger p. 20; Pyant pp. 74-75; Cheltenham p. 100) Consequently, all three doctors agree Defendant is not competent to stand trial. (Cloninger p. 7; Pyant p. 75; Cheltenham p. 100).

The Government opines that antipsychotic drug Halodol will render Defendant competent to stand trial in that it would help Defendant view the world in a rational and realistic way; decrease the intensity of delusional thought; decrease paranoia and suspicion; and enhance decision-making and judgement.   (Pyant p. 91) Consequently there is a substantial likelihood that Defendant would be restored to competency with the clinically accepted standard of treatment with antipsychotic medication.  (Cheltenham pp. 114, 122) Defendant argues that administering the proposed drug is not substantially likely to lead to improvement because of a) lack of sufficient scientific data that it does; b) what little data there is indicates that only 25% have benefitted; and c) administering such a drug to Defendant, who believes he is not ill, would make him worse.  (Cloninger pp. 10-11).

The Government takes the position that without the benefit of antipsychotic medication Defendant's prognosis is poor in that he is unlikely to give up or surrender his delusional beliefs in the foreseeable future.  (Cheltenham p. 101)  Moreover, antipsychotic medication has been successful in treating patients, such as Defendant, at FMC-Butner, (Cheltenham p. 102).

### 2. Substantial Unlikelihood of Side Effects

The Government proposes to administer Halodol for 2 to 4 months at 150 mg every 4 weeks.  (Government's December 13, 2007 Letter complying with December 5, 2007 Order; *see also* Cloninger p.10)  The Government and Defendant both agree that there are side effects that may result from administering the intended medication: 1) acute dystonia: a contraction of the muscles in the neck or eyes, and tongue which could lead to respiratory failure (laryngospasm).  This latter rare occurrence could occur within the first 7 to 10 days of treatment.  It can be treated successfully with anticholinergic medication administered orally, intra-venously, or by injection.   (Cheltenham pp. 108-109); 2) brain kinesia: mimicked Parkinson's syndrome of slowed movements and/or "blunted" facial expressions. It is treated with anticholinergic medications (Id.); 3) akathisia:   an inner sense of restlessness, anxiety, agitation.  It is treated by decreasing the dosage or switching to a second generation antipsychotic medication such as Propranolol or Ativan (Id. at pp. 109-

110); and 4) tardive dyskinesia:  distorted or contorted positions of the neck, facial grimacing, lip smacking, tongue protrusions.  This can occur after three months (Cloninger p. 12) or after six months to a year of treatment with Halodol.  (Cheltenham p.110)

Defendant opines that 8% of those taking the proposed medication will suffer tardive dyskinesia in the first year. (Cloninger p. 12)  Nine percent will suffer tardive dyskinesia in the first three months.  (Id.)  The Government and Defendant both agree that monitoring for side effects from the antipsychotic medication must be done and, if  side effects occur, medication should be ceased (Cloninger p. 24) or decreased in dosage.  (Cheltenham p. 110)  The Government opines that risks of side effects are further lessened by a short, four month term versus a life-time administration of the proposed medication.  (Cheltenham p. 111)  Moreover, the Government would administer a short-acting injection of Halodol along with Cogentin, which is a prophylactic for acute dystonia.  (Id.)  If acute dystonia symptoms do not occur, then a long-acting injection of Halodol would follow.  (Id. at pp. 111-112)  Brain kinesia and akathisia can also be monitored, treated and managed.  (Id. at p. 111)  Tardive dyskinesia is not a significant concern to the Government in that it is clinically unlikely to occur because of the proposed short-term administration of the antipsychotic medication.  (*Id.*).

The Court finds by clear and convincing evidence that the medication regimen FMC-Butner proposes is designed to reduce Defendant's delusions, restore normal thought processes, improve cognitive functioning in the courtroom and enable Defendant to assist his attorney.   Consequently, the medication is substantially likely to render Defendant competent to proceed to trial and substantially unlikely to produce side effects that would interfere with Defendant's ability to assist his attorney or that would be harmful to him.

C. The Possible Alternatives Factor

The Court "must conclude that involuntary medication is *necessary* to further [governmental trial-related] interests." *Sell*, 539 U.S. at 179, 181.

The Government opines that Court ordered involuntary administration of antipsychotic  medication is the prescribed method.  This position is based upon the fact that

1   1) Defendant is incarcerated.  (Cheltenham p. 104); 2) it is short-term treatment.  (Id. at p.

2   112); 3) Defendant can be monitored for side effects. (Id. at p. 114); 4) complementary

3   ancillary modalities, such as a) competency restoration classes, b) vocational rehabilitation

4   services, c) psychosocial relaxation services, d) animal assisted services, e) art therapy; f)

5   recreational and exercise activities, are available at FMC-Butner, (Id. at p. 124); and 5) staff

6   at FMC-Butner are actively involved in improving, on an ongoing basis, a patient's progress

7   to restoration.  (Id. at pp. 133-134)

8        Defendant argues that he is particularly sensitive to any threat to his authority; is

9   easily humiliated; has difficulty trusting authorities; and does not believe he is ill or in need

10  of medication. Consequently, with these beliefs he should not be forcibly medicated.

11  (Cloninger p. 10-11)  An alternative and less intrusive treatment is to establish a trusting

12  alliance with a psychiatrist; one who will advocate for the patient's welfare.  (Id. at p. 13)

13  That psychiatrist should be careful about challenging Defendant's beliefs and also show

14  respect for such beliefs without agreeing that such beliefs are realistic or reasonable.  (Id. at

15  p. 15)  If this is done, then it is likely that Defendant would show improvement.  (Id.)

16  Defendant's relationship with personnel at FMC-Butner has been compromised in that

17  Defendant feels they are not working in his best interest; they demean him; they have set out

18  to humiliate and embarrass him; they have violated his human rights; and he distrusts them.

19  (Id. at p.17) By involuntarily medicating Defendant, i.e., taking away his ability to make free

20  choices and his sense of autonomy, he will resist and his delusional disorder will become

21  more grandiose in proportion to how much he is forced to do things against his will.  (Id. at

22  p. 20)  Defendant opines that it would take a few months to establish a trusting alliance

23  particularly in a prison setting.  (Id. at p. 65)  A therapist from outside the prison system

24  would be an essential innovation for Defendant's delusional disorder.  (Id. at p. 66)

25  Defendant offers no time-frame within which this proposed less intrusive treatment plan

26  would result in Defendant's restoration to competency.

27        The Court finds that Defendant's proposed alternative and less intrusive treatment is

28  unlikely to achieve the same results as involuntarily administered antipsychotic medication.

1   Such proposal is based on a two hour ten minute long video teleconference interview of

2   Defendant (Cloninger p. 14; Cloninger Report, p.2) unlike the Government's extended

3   examinations and observations.  (Pyant pp 71, 73, 75; Cheltenham pp. 97-98).  There are no

4   less intrusive alternative treatment measures available capable of restoring Defendant to

5   competency within the foreseeable future; i.e., six months to a year.  (Cheltenham p. 115)

6   Less intrusive treatment as proposed by Defendant is unlikely to achieve the same results as

7   medication.  Defendant 1) does not believe he is mentally ill; 2) does not believe he needs

8   medication; 3) does not believe he needs treatment of any kind; and 4) is vested and fixed

9   in his delusional ideation.  Consequently, he lacks insight into his illness and is unlikely to

10  engage in psychotherapy.  He has refused to take medication and has been uncooperative.

11  His illness impairs his ability to comply with instructions.  He harbors elaborate delusions

12  that involve the correctional system generally, and his caretakers in particular, in conspiracies

13  against him.  For these reasons the Court finds by clear and convincing evidence that

14  involuntary medication as proposed is necessary to further the Government's concomitant

15  interests.

16          D. The Medical Appropriateness Factor

17          The Court "must conclude that administration of the drugs is *medically appropriate*,

18  i.e., in the patient's best medical interest in light of his medical conditions."  *Sell*, 539 U.S.

19  at 181 (emphasis in original).

20          "Medical appropriateness" endeavors to project into the future the state of a

21  defendant's condition with and without antipsychotic medication: 1) will a defendant be

22  substantially harmed if administered antipsychotic medication?; 2) will a defendant

23  experience long-term effects from the medication?; 3) if left untreated will a defendant's

24  condition worsen or result in a permanent mental disorder? The first two considerations have

25  been addressed in B.1 and 2, *supra*, and the substantial likelihood of returning Defendant to

26  competence and the substantial unlikelihood of side effects as discussed therein and

27  conclusions arrived at are incorporated in their entirety.

28

If Defendant's delusional disorder grandiose type is left untreated, then as the Government posits, such condition will persist and result in a permanent mental disorder. Defendant was born December 28, 1953 in Ciudad Obregon, Mexico. (Status Report, p.2) His family was extremely poor. (Cloninger p. 18)  Defendant's psychosis is of recent vintage. Defendant has recently self-reported that in 1980 when wandering hungry through the desert he prayed asking God to help him. (Id.) He stood up to find food from God which saved him from starvation. (Id.) Defendant has recently self-reported that in 2005 he began having vivid dreams from God that he should be released from incarceration or disasters would be visited upon the United States. (Id.)  Thereafter, disaster occurred, e.g. Hurricane Katrina, and Defendant saw himself as a prophet from God asserting that if he is not presently released other disasters will be visited upon the United States (Id. at pp 18-19)  Although Defendant has had extensive contact with the criminal court system, previous contacts did not reveal any psychosis in Defendant. (Id. at p. 61)  Defendant was arrested and incarcerated in 1999 and while incarcerated his psychosis developed. (Id. at p. 62)  If released from incarceration, Defendant will be deported and returned to his country of origin and placed in an uncertain and unknown therapeutic environment.  There is nothing that reasonably supports Defendant's suggestion that "release [of Defendant] from incarceration would be expected to improve his mental state, or at least to provide conditions that would facilitate his recovery." (Cloninger Report, pp. 15-16).

Defendant's present pragmatic legal standing and health condition is that of one 1) accused of Illegal Re-entry After Deportation; 2) facing up to 20 years statutorily and 100 to 125 months under sentencing guideline provisions; 3) who is presently incarcerated; 4) incompetent; 5) restorable through monitored medication within a matter of months; and 6) without realistic prospect of either time or services to otherwise obtain competency.  The proposed medication regimen will be closely monitored and is unlikely to harm Defendant. Defendant does not have any underlying medical conditions that would preclude or be worsened by the use of antipsychotic medication.  For these reasons the Court finds by clear and convincing evidence that it is medically appropriate to order involuntary administration

1   of antipsychotic medication and in Defendant's best medical interest in light of his medical
2   condition.

3   III. CONCLUSION:

4         Having considered the *Sell* factors and Defendant's incompetence to proceed to trial
5   and having concluded that all of the *Sell* factors have been satisfied by clear and convincing
6   evidence, the Magistrate Judge recommends that the District Court:

7         A.  Order Defendant returned to FMC-Butner pursuant to 18 U.S.C. §4241(d)(2)(A)
8   for a reasonable period of time not to exceed four months, to restore him to competence to
9   proceed to trial;

10         B.   Order Defendant involuntarily medicated in conformity with the prescribed
11   regimen: 150 mg of Halodol administered every four weeks for 2 to 4 months;

12         C.   Order FMC-Butner to request of Defendant that he voluntarily take medication
13   orally before each and every scheduled administration of medication by injection.   If
14   Defendant does not agree to take medication, FMC-Butner is authorized to administer the
15   medication by injection;

16         D.   Order FMC-Butner to monitor Defendant for side effects resulting from the
17   administration of medication;

18         E.  Order FMC-Butner to file a status report with the Court, with copies of same to
19   Government and defense counsel, every 15 days.   Such report shall include results of
20   treatment including but not limited to: a) any side effects; b) reduction and/or cessation of
21   medication and/or treatment with anticholinergic medication; c) substitute second generation
22   anitpsychotic medication; and d) evaluation of Defendant's ongoing condition and progress;
23   and

24         F. Order that, after FMC-Butner's treating physicians believe that the medication has
25   restored Defendant to competency, FMC-Butner shall file a report with the District Court
26   with copies of same to Government and defense counsel regarding the results of Defendant's
27   treatment; how the medication is to be continued; the type, dosage, and frequency of

28

1   medication that is to be continued; how medication will affect defendant at trial; and how to

2   closely monitor the effects of medication that is to be continued.

3        Pursuant to 28 U.S.C. §636(B) any party may serve and file written objections within

4   10 days after being served with a copy of this Report and Recommendation.  If objections

5   are filed, the parties should use the following case number: CR 06-1289-TUC-FRZ.

6        If objections are not timely filed, then the parties right to *de novo* review by the

7   District Court may be deemed waived.  *See United States v. Reyna-Tapia*, 328 F.3d 1114,

8   1121 (9th Cir.) (*en banc*), cert. Denied, 540 U.S. 900 (2003)

9        The Clerk of the Court is directed to send a copy of this Report and Recommendation

10   to counsel.

11        DATED this 3rd day of June, 2008.

14   _____

          Héctor C. Estrada
     United States Magistrate Judge

- 22 -